IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF AIDEN W.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF AIDEN W., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

AMBER W., APPELLANT.

Filed August 2, 2022.    No. A-21-1044.

Appeal from the Separate Juvenile Court of Douglas County: AMY N. SCHUCHMAN, Judge. Affirmed.

Sarah E. Cavanagh, of Houghton, Bradford & Whitted, P.C., L.L.O., for appellant.

Lindsey Stennis, Deputy Douglas County Attorney, and Traemon Anderson, Senior Certified Law Student, for appellee.

PIRTLE, Chief Judge, and BISHOP and ARTERBURN, Judges.

BISHOP, Judge.

INTRODUCTION

Amber W. appeals from the decision of the separate juvenile court of Douglas County terminating her parental rights to her son, Aiden W. We affirm.

BACKGROUND

PROCEDURAL BACKGROUND

Amber is the biological mother of Aiden, born in 2018. It does not appear that Aiden's alleged father was part of the juvenile proceedings below and he is not involved in this appeal.

Aiden was removed from Amber's home in February 2020 because of concerns regarding domestic violence and substance abuse.

The State filed a petition on February 14, 2020, alleging that Aiden fell within Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). The State alleged: Amber engaged in domestic violence while Aiden was in the residence; Amber's use of alcohol and/or controlled substances placed Aiden at risk for harm; Amber failed to provide Aiden with proper parental care, support, supervision, and/or protection; Amber failed to provide Aiden with safe, stable housing; and for the above reasons, Aiden was at risk for harm. The State also filed a motion for the immediate temporary custody of Aiden to be placed with the Nebraska Department of Health and Human Services (DHHS), and the juvenile court entered an ex parte custody order that same day. Aiden has since remained in the custody of DHHS and in foster care.

Following a protective custody hearing on February 20, 2020, Amber was "invited" to undergo a co-occurring evaluation, consult with her psychiatrist for follow up and medication, and participate in family support services. Amber was to have supervised visitation with Aiden.

On April 17, 2020, the juvenile court, upon motion by counsel for Amber, appointed a guardian ad litem (GAL) for Amber.

On May 13, 2020, Aiden was adjudicated as being within the meaning of § 43-247(3)(a) based on Amber's "admission plea" to the allegations in the petition that she engaged in domestic violence while Aiden was in the residence and that Aiden was at risk for harm; the remaining allegations in the petition were dismissed by the State. The juvenile court ordered Amber to undergo a co-occurring evaluation with St. Francis (part of her plea agreement) and have supervised visitation with Aiden.

On June 9, 2020, DHHS filed an ex-parte motion to suspend Amber's visitation pending the disposition hearing; the juvenile court entered an ex-parte order suspending visitation that same day.

Following a disposition hearing on June 22, 2020, the juvenile court ordered Amber to: undergo a co-occurring evaluation and sign a release of information so that the results could be obtained by DHHS/Saint Francis Ministries; attend and participate in a minimum of one "AA/NA" meeting per week, obtain a sponsor, and provide written proof of attendance and sponsorship; continue to work with her peer support worker; meet regularly with her case manager; have no direct contact with Aiden's foster parents; attend all mental health and physical health appointments and provide proof of attendance; increase her supports by joining groups such as AA/NA or Circle of Security and provide proof of attendance; attend an empowerment class and provide proof of attendance; regularly attend psychiatric appointments and provide proof of attendance; and take all medications as prescribed. The court ordered DHHS/Saint Francis Ministries to schedule Zoom visitation two to four times per week, depending on Amber's mental health. The visitation worker had the discretion to cancel or end the visitation early if Amber did not focus on the child or displayed angry or argumentative behaviors.

On July 28, 2020, the juvenile court, upon motion by Aiden's GAL, entered an ex-parte order immediately suspending visitation between Amber and Aiden. On August 5, the court, upon motion by Aiden's GAL, reinstated Amber's supervised visitation.

Following a continued disposition and permanency planning hearing on August 20, 2020, Amber was ordered to undergo an updated co-occurring evaluation and sign a release of

information; work with her community support worker; and submit to random, frequent, and observed urinalysis (UA) testing and sign a release of information. The remainder of the court-ordered requirements were the same as they were in the June order.

On September 11, 2020, Aiden's GAL filed an ex-parte motion to suspend Amber's visitation because of Amber's verbal harassment of a visitation worker while Aiden was present, the effect of the situation on Aiden, and the recommendation of Aiden's therapist that visitation be suspended; the juvenile court entered an ex-parte order suspending visitation that same day. Following an evidentiary hearing on September 23, the court ordered that Amber's visitation continue to be suspended and that she "have no contact directly or indirectly" with Aiden.

Following a review and permanency planning hearing on November 17, 2020, the juvenile court ordered that visits between Amber and Aiden remain suspended because: Amber was not compliant with her psychiatric appointments and was unmedicated; Amber tested positive for methamphetamine; and Aiden's traumatic symptom expression had significantly decreased since visits were suspended. The remainder of the court-ordered requirements were the same as they were in the June and August orders. Following review and permanency planning hearings on February 11 and May 20, 2021, the court-ordered requirements were the same as they were in the June, August, and November 2020 orders, and Amber's visits remained suspended.

On July 19, 2021, the State filed a motion to terminate Amber's parental rights to Aiden pursuant to Neb. Rev. Stat. § 43-292(2), (6), and (7) (Reissue 2016). The motion alleged as follows: Amber substantially and continuously or repeatedly neglected and refused to give the juvenile or a sibling of the juvenile necessary parental care and protection. Reasonable efforts to preserve and reunify the family had failed to correct the conditions leading to the adjudication of the child under § 43-247(3)(a). Aiden had been in an out-of-home placement for 15 or more months of the most recent 22 months. Termination of Amber's parental rights was in the best interests of Aiden.

TERMINATION HEARING

A hearing on the motion to terminate Amber's parental rights was held on November 19, 2021. The State called three witnesses to testify, and several exhibits were received into evidence. Amber did not testify in her own behalf. A summary of the relevant evidence follows.

According to DHHS court reports and case plans received into evidence, Amber had a history of intakes with DHHS dating back to 2010, and Amber's mental health and drug use, as well as domestic violence, were recurring themes in those intakes. In 2016, Amber had two daughters adjudicated to be within § 43-247(3)(a) after Amber admitted to allegations regarding her drug and/or alcohol use and domestic violence that placed the children at risk of harm. She relinquished her parental rights to those two girls in February 2018 and she gave birth to Aiden 7 months later. Aiden was removed from Amber's home in February 2020 because of concerns regarding Amber's drug and/or alcohol use and domestic violence.

The DHHS court report and case plans revealed that beginning in February 2020, Amber was allowed supervised visits with Aiden, but by the end of the month she was placed on confirmation status due to her inconsistency. In March, Amber began virtual visits due to restrictions resulting from the COVID-19 pandemic; she resumed face-to-face visits in May. During a visit in June, Amber "got increasingly upset while talking to the visitation worker about [her] case," and was holding Aiden while yelling at the worker; Amber "continued to escalate and

become more upset" and she threatened to kidnap Aiden. Aiden's GAL filed a motion to suspend visits, and visits were suspended until mid-June. From mid-June to mid-August, Amber was offered two Zoom visits per week with Aiden; of the 12 visits offered, Amber attended 9 visits, ended 2 early, and cancelled or did not timely confirm 3 visits. Due to Aiden's "trauma expression following visits with Amber," Aiden's GAL filed another motion to suspend visits, and visits were suspended on September 11, 2020.

Jayna Baczwaski, a licensed independent mental health practitioner, provided child-parent psychotherapy for Aiden and his caregivers for 17 months. Baczwaski testified that Amber called her in March 2020 requesting child-parent psychotherapy and said that her DHHS worker told her she needed a child-parent psychotherapy evaluation.

Baczwaski had six scheduled contacts with Amber from April 17 through May 29, 2020; Amber "complete[d] two of those and part of another" and "there was several no-show/no calls or rescheduled appointments." In May, Baczwaski explained to Amber that she (Amber) was not able to participate in therapy with Aiden at that time. Baczwaski stated that Amber presented as a mother who cared deeply for her child and as a woman with a great trauma history. "At times Amber had wonderful insight into her own needed services, services for her child," but "[a]t other times Amber could become extremely belligerent and de-escalate into verbal abuse," and "[t]here was also quite erratic behavior." Baczwaski's concerns regarding Amber's participation in parent-child psychotherapy were her self-reported alcohol and drug use; "a constellation of [observed] mental health concerns, including psychiatric, including reality testing and perception and orientation, as well as untreated, unmedicated reported conditions" (Amber self-reported a bipolar disorder); and a level of dysregulation that would need to have sustained improvement for participation in interactions with Aiden.

To diagnose and treat Aiden, Baczwaski relied on her own observations as well as collateral information, including information provided by Amber, a DHHS caseworker, and the foster parents. When Baczwaski first started working with Aiden, he was experiencing:

clinically significant dysregulation, including tantrums, physical aggression to others in the form of hitting, punching, throwing, using objects to strike, and kicking; physical aggression to his self, self-harming, throwing himself on the floor, banging his head repeatedly; regression/loss of prior skills, including walking and talking; severe clinical dissociation lasting four [sic] hours, occurring both at home, in day care, and in therapy; clinically significant distress with physical aggression; concerning violent and sexualized play with toys observed both in session and at home; concerning bath time behavior in which Aiden held his teenage foster sibling's head underwater during bath time so that he could not breathe repeatedly; recurrent nightmares in which Aiden was able to be comforted by foster parents as well as night terrors in which he was not; recurrent checking and eating food and non-nutritive items out of the foster family's trash can; preoccupation with the pantry; and severe dysregulation if others received -- were served food before him, both at home and at child care. Recurrent significant distress when exposed to trauma reminders. These specifically included loud noises, including positive praise and clapping and verbal abuse. Later we discovered that birthdays and . . . sirens from emergency vehicles were additional trauma reminders. Recurrent lapses into moods of persistent sadness or fearfulness. Withdrawing; social withdrawal, isolation; refusal to engage in

preferred activities; refusal of efforts to soothe; again, escalating to clinical dissociation. Crying and inconsolable for hours to the point where he would pass out, requiring him to be picked up from child care; threatening loss of child care services; recurrent avoidance of stimuli associated with visitation at times with biological mother; recurrent avoidance of stimuli associated with taking a bath, to the extent that Aiden had to be sponge bathed; hypervigilance at bedtime, which contributed to severe sleep disturbance, severe distress, and refusal to get into his car seat or high chair or crib. He had an exaggerated startle response and frequent . . . anger outbursts with little provocation.

According to Baczwaski, Aiden's symptoms "fall under trauma symptom constellation," meaning that Aiden "exceeded diagnostic criteria for post-traumatic stress disorder in children ages six and younger." She described Aiden's symptoms as "[c]linically significant" and "[s]ome of the highest I've seen in 11 years." Baczwaski testified that child-parent psychotherapy is the "recommended modality for a child ages zero to five who has experienced traumatic experiences, specifically because it is a therapy that involves caregiver presence as the vehicle to restore attachment and mental health in the child."

Baczwaski said she made three recommendations for Aiden's therapy. The first was for Aiden to participate in child-parent psychotherapy with his foster mother and then his foster father. The second was for the caregivers involved to participate in "Circle of Security Parenting intervention." The third was for Amber to "complete an updated dual diagnosis mental health and substance use evaluation that was trauma informed and that she both showed sustained and verified progress engaging in services so that [Baczwaski] could reassess her at a future time for participation in therapy with [Aiden]."

Baczwaski stated that Aiden engaged in child-parent psychotherapy with his foster parents. From June through September 2020, Aiden's dysregulation became so severe that therapy services were provided twice weekly and there were "probably three to four times weekly crisis phone calls that were occurring during that time." There was a correlation between Aiden's dysregulation and his visits with Amber, "to the extent that during visitation Aiden would devolve into self-harming behavior, fight/flight/freeze behavior, aggressive behavior" which would continue post-visitation. On September 22, Baczwaski recommended that Amber's visitation with Aiden be suspended until Amber was able to demonstrate improved stability; interruption in substance use; improved stability in mental health, psychiatric, and reality testing; and improved stability in being able to regulate herself so that she could regulate Aiden. Since her recommendation in September, Baczwaski's concerns regarding visitation had not been alleviated.

Baczwaski stated that at the end of September 2020, Aiden's therapy was reduced to once or twice weekly. However, around March 8, 2021, Aiden experienced a disrupted placement in foster care "that resulted in a regression back into a lot of his trauma symptoms"--he has experienced caregiver loss in his life and one of his known dysregulation triggers is transitioning routine--so therapy was increased to twice weekly. During that time, for about 2½ to 3 months, therapy focused on helping Aiden transition to his new foster home. Then Aiden began child-parent psychotherapy with his new foster family. Since the end of June, therapy occurred once each week. According to Baczwaski, "Aiden continues to meet the diagnostic threshold for PTSD diagnosis," but "the intensity and frequency [and number] of his trauma symptoms" have

decreased over the course of therapy. She said that Aiden will continue to need therapy "for some time."

In addition to therapy services with Baczwaski, Aiden "requires therapeutic intervention at child care in the academic setting" and "requires trauma-informed parenting in the home." Baczwaski attributed the progress Aiden has made to "[b]rain work done through attachment" and the fact that he has had "21 months in a physically and environmentally reported safe home." For Aiden to continue to progress, he will need trauma-informed care in multiple settings, physical and emotional stability, and relational safety. Baczwaski's concern with Amber's ability to provide Aiden with the necessary structure was that Baczwaski had received no evidence that Amber had been able to make sustained progress regarding her own needs.

Before Baczwaski could recommend that Amber participate in child-parent psychotherapy with Aiden, she needed to see Amber complete the recommended evaluations and make therapeutic progress. In May 2020, Amber indicated that she would sign releases requested by Baczwaski, but at later dates she "belligerently refused to." For 17 months prior to the termination hearing, Baczwaski "requested repeatedly for releases of information" from Amber for her providers, but Baczwaski had not received and had been refused releases signed by Amber. Baczwaski also "provided additional detail to both Amber and her legal team" of specifically what she needed to see for improved stability. Baczwaski's concerns regarding Amber's ability to participate in therapy with Aiden have not been alleviated because Baczwaski had not received information that Amber completed an updated dual diagnosis evaluation, maintained substance use recovery outside of a controlled environment, had improved psychiatric mental health, and had improved regulation skills. Baczwaski stated that if issues are not addressed, then Amber's participation in therapy could cause Aiden to experience re-exposure to trauma triggers. On cross-examination, Baczwaski confirmed that she did not provide therapeutic visits between Amber and Aiden, and she never observed Amber interact with Aiden.

KasieAnn K. testified that she has been Aiden's foster mother since March 2021; prior to that, she provided respite for Aiden beginning in October 2020. KasieAnn has had no contact with Amber, and Aiden has not had any contact with Amber while residing with KasieAnn because contact was prohibited by the juvenile court. Aiden has not mentioned his mother to KasieAnn.

KasieAnn stated that when Aiden was first placed with her, "[he] would bite himself, hit himself, smash his head into the wall, [and] throw himself on the ground"; "[h]is ability to self-regulate or regulate in any capacity was very minimal." Aiden also had eating and defecating issues. She said he "would only eat chicken nuggets and hot dogs," "would hoard food," and "would try to eat out of the garbage can." And he "would either refuse to poop and hold it until he got constipated or he would have diarrhea."

KasieAnn observed Aiden become "dysregulated or triggered by police or ambulance or fire truck sirens, loud noises, screaming, yelling, or sudden movements." On one occasion, when she and Aiden were driving home from a doctor appointment, they passed by the firehouse when the fire truck was coming out; she said, "Aiden went from talking to me about the doctor's appointment to [screaming] they're going to get me, they're going to get me, and then completely just dissociating." KasieAnn had to pull the car over, unstrap Aiden, and then wait "until he came back"; "once he came back around, he was just like, Mommy, I want a sandwich, and went about his way."

Aiden's behavior issues were being addressed in therapy and with trauma-informed care. To help regulate Aiden during behavioral episodes, the foster parents did "a lot of trauma interventions, trauma knowledge interventions," "[s]o a lot of heavy pressure, calm based, kind words, gentle touches, and just general ability to stay calm and collected during those episodes until he comes back around." Routine and structure also helped with Aiden's ability to self-regulate. In the beginning, Aiden's behaviors were occurring weekly, but "[n]ow we're back to once a month."

KasieAnn stated that Aiden attends behavioral therapy once each week and occupational therapy twice each week. Aiden also has an individualized family support plan through the public school district "that involves developmental as well as behavioral aspects." He has home-based family engagement services through the school district once each week, and recently started a transition group that "takes him from [the foster home] and does like a mock preschool setting for him in a specialized, contained environment but for his needs."

Cheyenne Wilson testified that she has been employed by Saint Francis Ministries since November 2019, first as a case manager, and then, beginning in March 2021, as a supervisor. Wilson has been assigned to this case since the end of June 2021. Once assigned, she spoke with the supervisor of the previous case manager, reviewed the case file, and made contact with Amber, the foster parents, and the case professionals. Wilson said that Aiden came into care in February 2020 because there were concerns regarding domestic violence and substance use. Wilson testified that Amber had not had visits with Aiden since September 2020; prior to that, Amber had supervised visits with Aiden. Wilson had never seen Amber interact with Aiden. According to Wilson, Amber did not consistently work with the previous case manager.

According to DHHS court reports and case plans received into evidence, prior to Wilson's time on this case, Amber did not attend or provide proof of attending mental or physical health or psychiatric appointments; did not consistently take medications as prescribed; did not complete a co-occurring evaluation; did not comply with UA testing requirements; did not provide proof of attending AA/NA meetings; did not regularly or consistently meet with her case manager or attend family team meetings; and was twice discharged from peer/community support for lack of engagement.

An exhibit received into evidence revealed that Amber was discharged from drug testing services on January 11, 2021, after completing only 6 of 22 drug tests since October 24, 2020. According to the exhibit, on October 24 and 28, November 4, 9, and 12, and December 7, Amber tested presumptive positive for three to four substances--methamphetamine, marijuana, amphetamines, and/or alcohol--and each time she acknowledged using at least some of the substances within the previous 2 days.

After being assigned to this case at the end of June 2021, Wilson was able to contact Amber in July when Amber was at Douglas County Corrections. According to a report by Aiden's Court Appointed Special Advocate that was received into evidence, Amber had been incarcerated since July 10 "for a felony charge of terroristic threats"; there is no information in our record regarding a criminal conviction or sentence, but it appears Amber remained incarcerated at the time of the termination hearing.

Wilson stated that in July 2021, Amber was not sure how long she would be incarcerated but Amber believed she would be released soon. Amber reported that she was struggling with

being in jail, had not been able to be with the general population, and had frequently been in and out of lockdown. Because Amber had been in and out of lockdown, she was not able to participate in groups, such as AA. Wilson said that Amber talked about the upcoming termination of parental rights hearing and "indicated wanting to relinquish." In August, Wilson had a "very short," "less than five minute[]," contact with Amber. Wilson offered an update regarding Aiden, but Amber "reported that it was too difficult and she didn't want to have an update regarding Aiden at that time"; Amber "said she needed to go and hung up the phone." Wilson's September contact with Amber "was very similar to the visit in August," "[i]t was very short," "[l]ess than five minutes"; Amber "hung up the phone and said that there was nothing that she needed from me." Wilson was not able to meet with Amber in October because she had been removed from the contact list for Amber, but Wilson had not received any indication as to why she was removed. Wilson was able to meet with Amber in November and had a "productive conversation." Amber asked for an update regarding Aiden. Wilson stated, "Again, Amber had reported she wasn't fully sure what was going on in terms of when she would be released, but she appeared happy to know that Aiden was doing well."

Wilson testified regarding Amber's compliance with court orders during this case. Amber completed an initial co-occurring evaluation, but did not complete an updated evaluation. She participated in some drug testing, but was unsuccessfully discharged as noted above. Wilson stated that she could not provide Amber with UA testing because of her incarceration. Amber did not provide proof of participation in AA/NA. Wilson attempted to talk with Amber about her ability to do an evaluation while incarcerated, "but that was unsuccessful." Wilson did not contact the corrections facility to determine whether Amber was attending her mental and physical health appointments. Amber self-reported to Wilson that she was taking her medications. Wilson stated that Amber had not been able to participate in family team meetings due to her incarceration. And to Wilson's knowledge, Amber did not currently have a community support worker.

Wilson testified that Amber "has not demonstrated an overall consistency to meet with the case manager or alleviate the concerns that brought Aiden into care"; "[t]here have been numerous court orders that have not yet been completed," "[a]nd Aiden . . . has needs where he really needs some consistency and some structure, and at this time [Amber] has not been able to demonstrate an ability to provide that for him." Wilson opined that Amber "would not be fit to parent Aiden at this time" and it would be in Aiden's best interests to terminate Amber's parental rights.

JUVENILE COURT'S DECISION

In an order entered on November 29, 2021, the juvenile court found by clear and convincing evidence that statutory grounds for termination of Amber's parental rights existed pursuant to § 43-292(2), (6), and (7). The court also found that termination of Amber's parental rights was in the child's best interests. The court terminated Amber's parental rights to Aiden accordingly.

Amber appeals.

## ASSIGNMENTS OF ERROR

Amber assigns, restated, that the juvenile court erred in finding that (1) statutory grounds existed to terminate her parental rights, and (2) termination of her parental rights was in Aiden's best interests.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

## ANALYSIS

### STATUTORY GROUNDS FOR TERMINATION

The State sought to terminate Amber's parental rights under § 43-292(2), (6), and (7). The juvenile court found that all three grounds existed by clear and convincing evidence.

Section 43-292(7) allows for termination when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." By the plain and ordinary meaning of the language in § 43-292(7), there are no exceptions to the condition of 15 out of 22 months' out-of-home placement. *In re Interest of Mateo L. et al., supra*. Section 43-292(7) operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Mateo L. et al., supra*. In other words, if the 15-out-of-22 months' period is met, § 43-292(7) is met. See *In re Interest of Mateo L. et al., supra*. In this case, Aiden was removed from Amber's care in February 2020. He remained out of home through at least November 19, 2021, when the termination hearing was held; this satisfies the 15-out-of-22 months' period. We note that in her brief, Amber acknowledged that the State was able to show that Aiden was placed outside of the parental home for 15 of the most recent 22 months.

The State has shown clearly and convincingly that § 43-292(7) exists as a statutory basis for terminating the parental rights of Amber. And since any one of the bases for termination codified in § 43-292 can serve as the basis for termination, we need not consider the sufficiency of the evidence concerning the other statutory bases for termination. *In re Interest of Mateo L. et al., supra*.

Furthermore, we note that because we do not consider whether termination of parental rights was proper pursuant to § 43-292(6), Neb. Rev. Stat. § 43-283.01 (Cum. Supp. 2020), which requires reasonable efforts to reunify families, it is not applicable to the instant case. Section 43-283.01 is only incorporated into § 43-292(6), not into the remaining subsections of § 43-292. See *In re Interest of Andrew M. et al.*, 11 Neb. App. 80, 643 N.W.2d 401 (2002). See, also, *In re Interest of Mateo L. et al., supra* (reasonable efforts to reunify family required under juvenile code only when termination is sought under § 43-292(6)). We next consider whether termination is in Aiden's best interests.

Under § 43-292, once the State shows that statutory grounds for termination of parental rights exist, the State must then show that termination is in the best interests of the child. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). A child's best interests are presumed to be served by having a relationship with his or her parent. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). This presumption is overcome only when the State has proved that the parent is unfit. *Id.* Although the term "unfitness" is not expressly stated in § 43-292, the Nebraska Supreme Court has said that it derives from the fault and neglect subsections of that statute and from an assessment of the child's best interests. *In re Interest of Mateo L. et al., supra*. In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *In re Interest of Leyton C. & Landyn C., supra*. The best interests analysis and the parental fitness analysis are separate inquiries, but each examines essentially the same underlying facts as the other. *Id.* We have previously set forth the evidence presented at the termination hearing, and we will not recount it again here.

Notably, Amber has failed to comply with numerous court-ordered requirements. Amber did not attend or provide proof of attending mental or physical health or psychiatric appointments; did not consistently take medications as prescribed; did not complete a co-occurring evaluation; tested positive for drugs and alcohol or otherwise did not comply with UA testing requirements; did not provide proof of attending AA/NA meetings; did not regularly or consistently meet with her case manager or attend family team meetings; and was twice discharged from peer/community support for lack of engagement. Additionally, Amber's failure to complete the recommended evaluations and make therapeutic progress hindered her ability to participate in child-parent psychotherapy with Aiden, who has significant PTSD. As testified to by Wilson, "Aiden . . . has needs where he really needs some consistency and some structure, and at this time [Amber] has not been able to demonstrate an ability to provide that for him." Wilson opined that Amber "would not be fit to parent Aiden at this time" and it would be in Aiden's best interests to terminate Amber's parental rights.

The juvenile court found that it was in Aiden's best interests to terminate Amber's parental rights. Noting Aiden's "exceedingly high level of symptoms associated with his diagnosis" of PTSD and that he was only 21 months of age when he began therapy, the court pointed out his need for "ongoing therapy, as well as safe and attuned caregivers, well into the future." The court found that Aiden has "extraordinary needs due to the abuse and neglect he suffered while in his mother['s] . . . care" and that "[a]t a minimum, Aiden will need a safe, stable, and sober caregiver[.]" The court also observed that due to Amber's "belligerent and erratic behaviors towards the therapist, and her refusal to address her mental health and substance use, she was contraindicated for therapy" with Aiden. The court recognized Amber's "own significant trauma history," but concluded that Amber was "not in a position in the near future to even visit her child . . . let alone parent her child full-time." Finally, the court determined that Amber was "no closer to permanency than she was when her case first came before the Court" and "[i]n fact, [Amber] is in a worse position, as she is currently incarcerated."

We agree with the juvenile court's assessment of the evidence. Aiden, 3 years old, had been out of Amber's care for 21 months at the time the termination hearing concluded, and he had not seen her since September 2020 when visits were suspended. He deserves permanency. "Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity." *In re Interest of Walter W.*, 274 Neb. 859, 872, 744 N.W.2d 55, 65 (2008). And where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Ryder J., supra*. The State proved that Amber was unfit, meaning that she has a personal deficiency or incapacity which has prevented, or will prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to the child's well-being. See *In re Interest of Leyton C. & Landyn C., supra*. We further find that there is clear and convincing evidence that it is in Aiden's best interests to terminate Amber's parental rights.

CONCLUSION

For the reasons stated above, we affirm the order of the juvenile court terminating Amber's parental rights to Aiden.

AFFIRMED.